IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| LARUNDA LOUISE SCOTT, | 6:16-cv-01596-PK |
|---|---|
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| NANCY A. BERRYHILL,[1] Commissioner of Social Security, | |
| Defendant. | |

PAPAK, Magistrate Judge:

Plaintiff Larunda Scott ("Scott") filed this action on August 8, 2016, seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Tile XVI of the Social Security Act (the "Act"). This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The Court has considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be REVERSED and REMANDED for an immediate payment of benefits.

---

[1] Nancy A. Berryhill replaced Carolyn W. Colvin as Acting Commissioner of Social Security on January 20, 2017, and is therefore substituted as the Defendant in this action pursuant to Fed. R. Civ. Pro. 25(d).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, an Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation proceeds to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140–41; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the durational requirement, the claimant will be found

not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen*, 482 U.S. at 153–54). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" *Id.* (quoting SSR 85-28, 1985 WL 56856, at *3).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, Subpt. P, App. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis, despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p 1996 WL 374184, at *1.

At the fourth step, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets her burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet her burden at the fifth step. *See id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if the ALJ applied the proper legal standards and her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such

PAGE 4 – FINDINGS AND RECOMMENDATION

relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The court may not substitute its judgment for that of the Commissioner. *See id.* (citing *Robbins*, 466 F.3d at 882); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

## BACKGROUND[2]

Scott, born April 7, 1973, was 40 years old on the alleged disability onset date, and 41 years old at the time of the hearing. Tr. 250. She discontinued high school after completing the tenth grade. Tr. 255. Prior to her amended alleged disability onset date of April 8, 2013, Scott had past relevant work experience as a mess attendant, lead housekeeper, fast food worker, and banquet waitress. Tr. 30.

In March 2011, Scott presented to Dr. Douglas Jeffrey at Springfield Family Physicians for treatment of wrist and back pain. Tr. 349. She reported experiencing only temporary symptom relief after taking prescription pain medication, and a general lack of sleep due to her

---

[2] The following recitation constitutes a summary of the pertinent evidence within the Administrative Record, and does not reflect any independent finding of fact by the Court. Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12. Where evidence occurs in the record more than once, the Court will generally cite to the transcript pages on which that information first appears.

pain levels. *Id.* In regards to Scott's back complaints, Dr. Jeffrey noted tenderness in her back, a full range of motion, and a negative straight leg raise test. Tr. 350. Concerning her wrist impairments, the doctor noted tenderness at the dorsum, and positive Tinel's and Phalen's tests. Tr. 351.

In June 2011, Scott returned to Dr. Jeffrey due to increased back pain. Tr. 345. She reported experiencing numbness in both legs without pain radiating into her legs. *Id.* On examination, Scott had normal spine curvature, bilateral joint tenderness, a full range of motion, and a negative straight leg test. *Id.* Dr. Jeffrey prescribed a muscle relaxant. Tr. 346.

In August 2011, Springfield Family Physicians responded to a letter sent by the Oregon Department of Human Services requesting information about Scott's functional limitations.[3] Tr. 343-44. The response letter stated that Scott was able to lift twenty pounds occasionally and ten pounds frequently, could stand or walk for six hours in an eight-hour period, and could sit for eight hours in an eight-hour workday. *Id.* The letter also noted that Scott's restrictions began in January 2009, and were expected to last "indefinite[ly]." Tr. 344.

In October 2011, Scott established care with Dr. Eric Ackerman after injuring her right wrist at her housekeeping job.[4] Tr. 380. On examination, Dr. Ackerman noted some point tenderness, a reduced range of motion, and negative Phalen's and Tinel's tests. *Id.* He diagnosed de Quervain's tenosynovitis ("DQT"). For treatment, Dr. Ackerman prescribed Vicodin, referred

---

[3] Due to the illegibility of the signature, the Court notes that it is unclear who authored the letter.

[4] From October 2011 to December 2014, Scott was seen by Dr. Ackerman approximately 30 times. *See, e.g.*, Tr. 380-412, 566-72. For the sake of brevity, the Court will discuss Dr. Ackerman's considerable treatment history with Scott only when necessary.

Scott to physical therapy, and placed her on light duty. *Id.* Later that month, Scott began physical therapy at Atlas Physical & Hand Therapy. Tr. 493-96.[5]

In November 2011, Dr. Ackerman observed that Scott had made some improvement with physical therapy, but was still experiencing a "fair amount of pain." Tr. 382. On examination, he noted "exquisite tenderness to palpation over the [first] dorsal compartment," and a positive Finkelstein's test. *Id.* He continued to assess DQT and informed Scott that a cortisone injection was usually an effective treatment. *Id.* Dr. Ackerman kept the same light duty workplace restrictions in place, provided a Vicodin refill, recommended Scott splint and ice her wrist, and referred her to an orthopedic clinic. *Id.*

In January 2012, Scott presented to Slocum Orthopedics to discuss nerve testing performed on her wrist. Tr. 419. Physician's Assistant ("PA") Molly Emberlin documented abnormal test results, noting "evidence of moderate acute right median neuropathy at the wrist carpal tunnel [and] the sensorimotor components are affected." *Id.* Based on the test results, Scott was diagnosed with carpal tunnel syndrome ("CTS"), and her prior diagnosis of DQT was confirmed. *Id.* In discussing treatment, Scott informed PA Emberlin that she wanted to proceed with CTS release surgery and agreed to continue conservative treatment for her DQT. *Id.*

In July 2012, Scott returned to Dr. Ackerman for continued treatment of her wrist. Tr. 383. She explained to Dr. Ackerman the reason she had not returned since November 2011 was that her worker's compensation claim was denied, but she was able to resume treatment after

---

[5] Scott attended a significant number of physical therapy sessions at Atlas. Tr. 434-496. From October 26, 2011 to December 23, 2011, Scott attended nine physical therapy sessions until her worker's compensation claim was denied. Tr. 474-96. A December 23, 2011 progress chart noted Scott was "not making gains as would be expected." Tr. 475. Scott returned to Atlas for another round of physical therapy on December 27, 2013. Tr. 468. Between then and March 12, 2014, Scott attended an additional 14 therapy sessions. A March 26, 2014 record noted that Scott had "not made significant gains." Tr. 435.

learning she could appeal the denial. *Id.* On examination, Dr. Ackerman noted she had tenderness to palpation and a positive Finkelstein's test, but her range of motion was "actually pretty good." *Id.* X-rays revealed no fractures and "no erosive or degenerative changes of the wrist." Tr. 385. Dr. Ackerman placed Scott on light duty, issued her a new thumb splint, and referred her out to physical therapy. Tr. 383.

In September 2012, Dr. Ackerman noted some reduced range of motion in Scott's wrist, a negative Tinel's sign, and a positive Phalen's sign. Tr. 386. Dr. Ackerman diagnosed possible CTS and reiterated his original diagnosis of DQT. *Id.* Later that month, Scott returned to Dr. Ackerman. Tr. 387. Scott was ready to proceed with a cortisone injection, but it had not been accepted as part of her worker's compensation claim. *Id.* On examination, Dr. Ackerman noted tenderness to palpation over the first dorsal compartment, pain with a Finkelstein's maneuver, and a positive Tinel's sign. *Id.* He further noted that Scott "has had a lot of therapy and has not really appeared to have improved much regarding either the [CTS] or the [DQT]." *Id.* He continued Scott's limitation to light duty. *Id.*

In January 2013, Dr. Ackerman noted a positive Finkelstein's, Tinel's, and Phalen's tests, accompanied by tenderness and pain. Tr. 389. Dr. Ackerman advised Scott that there was no further treatment available until she could get her worker's compensation claim approved. *Id.*

In March 2013, Scott was seen again by Dr. Ackerman. Tr. 390. She endorsed increased pain in her wrist and experiencing a sensation in which all of her fingers would lock up. *Id.* Dr. Ackerman observed tenderness and a positive Finkelstein's test. *Id.* He kept Scott's light duty restriction in place and referred her to a hand specialist to make sure he was "not missing anything." *Id.* Later that month, Scott presented to the Sacred Heart Medical Center Emergency Department ("ED") with complaints of lower back pain radiating into her legs. Tr. 365-371. PA,

Heather Worthington, noted tenderness in her lower back and assessed sciatica. Tr. 366. Scott was prescribed anti-inflammatory and pain medications. Tr. 368-69.

In April 2013, Scott returned to Dr. Jeffrey for treatment of lower back pain. Tr. 338. She reported that her pain medication was giving little relief. *Id.* On examination, she demonstrated a full range of motion, a negative straight leg raise, and no tenderness or spasms were noted. Tr. 339. An x-ray of her lower back showed "normal alignment" of the spine, "no disc spacing narrowing [was] evident," and the soft tissues were unremarkable in appearance. *Id.* Dr. Jeffrey prescribed an anti-inflammatory and increased Scott's pain medication. *Id.* Less than a week later, Scott returned to the ED with continued complaints of back pain. Tr. 359-364. She was given narcotic pain medication at the ED and instructed to follow up with Dr. Jeffrey. Tr. 363. A few days later, Scott was again treated by Dr. Ackerman for her wrist. Tr. 392. Her symptoms remained unchanged and she had positive Phalen's, Tinel's, and Finkelstein's tests. *Id.* Dr. Ackerman kept Scott on a ten-pound lifting limitation and held off further treatment until he could review the results of an independent medical examination scheduled for the next week. *Id.*

On May 9, 2013, Scott protectively filed an application for DIB and SSI benefits, alleging a disability onset date of November 15, 2012. Tr. 227, 234. She later amended her alleged disability onset date to April 8, 2013. Tr. 249. Scott alleged disability due to "severe lower back pain, pain in both wrists, [and] depression." Tr. 254, 274.

In a function report submitted to the Social Security Administration ("SSA"), Scott detailed her days largely consisted of lying in bed due to her symptoms. Tr. 300. She could prepare sandwiches and attempt some household cleaning, but relied on her daughter for cooked meals and help with the cleaning. Tr. 301. She reported grocery shopping once a month for an

hour at a time. Tr. 302. Scott also stated she enjoyed spending time with her family, doing such activities as going to the park, a movie, or eating out. Tr. 303.

Scott returned to Dr. Ackerman in May and June 2013. Tr. 394-96. Her Phalen's, Tinel's, and Finkelstein's tests were positive, and Dr. Ackerman kept Scott's ten-pound lifting limitation in place. *Id.*

In July 2013, Dr. Ackerman administered a cortisone injection into Scott's wrist. Tr. 398. He prescribed Vicodin, continued the ten-pound lifting restriction, and advised Scott to continue wearing a splint. *Id.* Later in July, Scott began mental health counseling at a low-cost training clinic facilitated by the University of Oregon. Tr. 644. She attended a total of five counseling sessions from July to September 2013. *Id.* Her therapy ceased when she stopped returning the clinic's phone calls and letters to schedule appointments. *Id.*

In August 2013, Scott told Dr. Ackerman she had no noticeable improvement in her overall condition since the cortisone injection. Tr. 399. On examination, Dr. Ackerman noted some swelling, reduced range of motion, and a positive Finkelstein's test. *Id.* He further stated, "[a]t this point, I am concerned that maybe there is a compartmentalized tendon sheath that may need releasing." *Id.* Based on this concern, Dr. Ackerman noted that he needed a hand specialist's opinion. *Id.* He restarted Scott's physical therapy and kept her restricted to a ten-pound lifting limitation. *Id.* An examination conducted later that month revealed tenderness in the first dorsal compartment, and positive Finkelstein's, Tinel's, and Phalen's tests. Tr. 400. X-rays demonstrated no evidence of arthritis. *Id.* Dr. Ackerman ended his treatment note stating, "[t]he patient is attending therapy but my expectations now are becoming lower, and I think that she probably needs a [surgical] release."

In October 2013, Scott underwent a psychological consultation with State agency reviewing psychologist William McConochie, Ph.D. Tr. 372-78. During her interview with Dr. McConochie, Scott described symptoms of depression largely stemming from her physical conditions and inability to work. Tr. 373. On examination, Scott was able to recall three words immediately, but none after several minutes. Tr. 376. She was unable to spell the word "square," but could read several words, numbers, and letters. *Id.* She thought there were 46 weeks in a year, could not divide 24 by 3, would yell "fire" if she saw smoke in a movie theatre, and she was unable to provide an answer as to how a coat and suit are alike. *Id.* Based on her responses, conversational style, and reported difficulty in school, Dr. McConochie estimated Scott was "functioning in the low average range of intelligence." *Id.*

In terms of daily activities, Scott described difficulty bathing, dressing, and cooking due to her wrist problems. *Id.* She did not drive due to not having a license, but was capable of riding public transportation, usually while accompanied by one of her daughters "in case her legs g[a]ve out." *Id.* She could not perform any household chores, instead relying on her daughters for those tasks. Scott relayed that for recreation she enjoyed sitting and talking with family members. *Id.* She also reported using cannabis socially approximately twice a week and denied alcohol or tobacco use. Tr. 372. Dr. McConochie diagnosed adult onset dysthymic disorder. Tr. 377. He opined that Scott was mildly impaired in the areas of understanding and remembering instructions, and sustaining concentration, attention, or persisting. *Id.*

In November 2013, Scott was again seen by Dr. Ackerman for her wrist and back conditions. Tr. 406. She reported that she had "severe pain over the past three days" and could not sleep. *Id.* She described that her main source of pain was emanating from her wrist, secondary to lower back pain. *Id.* Dr. Ackerman noted that Scott was "crying somewhat

profusely" due to pain. *Id.* On examination, he noted Scott's wrist was "very tender," there was a noticeable deficit in her range of motion, and she had "a very positive Finkelstein's test." *Id.* Dr. Ackerman had to curtail his examination of Scott's wrist due to unbearable pain levels. *Id.* In regards to Scott's back, Dr. Ackerman noted "very significant tenderness" without spasms. *Id.* He prescribed a muscle relaxant, kept Scott's ten-pound lifting limitation in place, and noted that she would continue with physical therapy. *Id.*

In January 2014, Dr. Ackerman noted a "very positive response to Finkelstein's test," and referred Scott to a specialist to inquire if she was a good candidate for surgical release of the tendon sheath. Tr. 409. Later that month, Dr. Ackerman opined that "conservative care has not helped [Scott] overall." Tr. 411. Noting "exquisite tenderness to the lightest ulnar deviation and Finkelstein's maneuver," Dr. Ackerman included "minimal use of the affected hand" to Scott's workplace restrictions. *Id.* A few days later, Scott presented to Dr. Thomas Macha at Slocum Orthopedics for a consultation on her wrist condition. Tr. 413-20. On examination, Dr. Macha noted tenderness over the dorsal and palmar aspects of Scott's wrist, a positive Finkelstein's test, "somewhat equivocal Tinel's and Phalen's testing," and weakness in her grip. Tr. 417. X-rays showed "no unusual arthritic changes," a "[s]light ulnar-positive variance," and a cyst in Scott's thumb. *Id.* Dr. Macha assessed DQT and "residual evidence of [CTS]." *Id.* He further noted that "the issues of her work comp status as well as compensability for this condition [must] be established prior to her undergoing any definitive treatment." *Id.* Dr. Macha's recommended course of treatment was to immobilize Scott's wrist in a cast "for three weeks or so," and, if that did not help, revisit the possibility of surgical release. *Id.*

In March 2014, Dr. Ackerman noted that Scott's past treatment "ha[d] not been helpful." Tr. 508. He filled out referral paperwork for Dr. Macha to perform a release surgery, and

restricted Scott to a "five-pound lifting limit, minimal repetitive grasping, and minimal use of the right hand." *Id.* Dr. Ackerman kept these lifting and manipulation limitations in place until the last appointment of record, dated August 29, 2014. Tr. 499, 500, 502, 504, 506-07, 566-72.

An MRI taken of Scott's wrist in June 2014 showed "no ligament or tendon tear," "no acute bony abnormality," and normal "position and alignment" of the joints." Tr. 511.

In July 2014, Scott began mental health therapy sessions at Options Counseling and Family Services. Tr. 556-65. She reported symptoms of depression, anxiety, fatigue, post-traumatic stress disorder ("PTSD"), overeating, and hopelessness. Tr. 556. She alleged being "very traumatized by not being able to work as she has always worked." Tr. 557. She conveyed that she drank two tall cans of beers every three days and, since the age of 13, smoked two cigars of cannabis daily. *Id.* Her counselor diagnosed dysthymic disorder and PTSD, and recommended counseling. Tr. 562. The record reflects that Scott attended several therapy sessions until December 2014, and was still in counseling at the time of her hearing. Tr. 70, 512-555. Later in July, an x-ray taken of Scott's lumbar showed normal spine alignment, "no fracture, dislocation, or bony destruction," and unremarkable soft tissues. Tr. 576.

In November 2014, PA Emberlin noted that Scott had "failed to improve with all conservative treatment including physical therapy, immobilization, corticosteroid injection[, and] activity modification." Tr. 649. The only option left was surgical release. Tr. 652. At the time of the hearing two months later, Scott was waiting for the surgeon's office to determine whether the operation was covered by the Oregon Health Plan. Tr. 57.

In December 2014, as part of her application for disability benefits, Scott was seen by Dr. Scott Alvord for a psychological evaluation. Tr. 632-43. Dr. Alvord conducted a clinical interview, mental status examination, record review, and administered a series of cognitive

functioning tests. Tr. 632. Scott reported substantially the same psychological symptoms as already discussed, *e.g.*, depression and anxiety stemming from the loss of her job, and PTSD caused by past domestic abuse. Tr. 633-34. Scott also informed Dr. Alvord that she was smoking four cigars of cannabis and drinking approximately three 24-ounce cans of malt liquor daily. Tr. 634-35. She stated that she "attempts to complete chores around the house but is plagued with limited motivation as well as physical issues." Tr. 635. Dr. Alvord noted that although Scott was quite tearful throughout the encounter, her thought processes were intact and linear, and her psychomotor movements and speech were within normal limits. Tr. 635-36.

Dr. Alvord documented that Scott's long-term and short-term memory were intact; she was able to instantly recall three out of three words, and two of three after a five-minute delay; she recited five digits forward and four digits backward; she calculated five times nine and 24 divided by four, and spelled "world" forward and backward correctly. Tr. 636. On examination, Scott scored borderline to low-average scores on intelligence testing, her verbal comprehension scores were in the lower-fifth percentile, perceptual reasoning ranged from the fifth to the fiftieth percentile, and her working memory and processing speed were sub-tenth percentile. Tr. 637. Dr. Alvord diagnosed: alcohol abuse; cannabis abuse; PTSD, chronic, moderate to severe; and major depressive disorder, recurrent, moderate. Tr. 638. He gave provisional diagnoses of: pain disorder associated with both psychological factors and a general medical condition, and borderline intellectual functioning. *Id.* Dr. Alvord assigned a global assessment of functioning

("GAF") score of 50.[6] *Id.* Dr. Alvord stated that it was "noteworthy that she is abusing alcohol and cannabis at this time but I believe her use of substances is directly related to the fact that she has received very limited psychiatric care and [PTSD] issues have not been addressed." *Id.*

In a check-the-box form accompanying his psychological report, Dr. Alvord opined that Scott was markedly limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, including attendance and punctuality; complete a normal workday or workweek without interruption from psychological symptoms; accept instructions and appropriately respond to criticism; and travel to unfamiliar places or use public transportation. Tr. 640-43.

In January 2015, an MRI taken of Scott's lumbar showed "desiccation of the L5-S1 disc," "a tear of the annulus," "a mild diffuse disc bulge but no large protrusion or extrusion," "no resulting central canal stenosis or displacement of the transiting S1 nerve roots," "findings of left-sided neural foraminal stenosis," and "mild diffuse bulge" of the T11-T12 disc. Tr. 660.

On January 23, 2015, a hearing was conducted before ALJ Katherine Weatherly in connection with Scott's application for benefits. Tr. 45-85. Scott, her counsel, and Jay Stutz, a Vocational Expert ("VE"), were present. *Id.* At the hearing, Scott testified in relevant part that

---

[6] While relevant, a "GAF score does not determine disability." *Davis v. Astrue,* 2012 WL 4005553, at *9 (D. Or. June 12), adopted by 2012 WL 3614310 (D. Or. Aug. 21, 2012) (internal citation omitted). "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert,* 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). According to the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), "a GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.' A GAF score between 51 and 60 describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning." *Garrison v. Colvin,* 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (quoting DSM-IV); *but see Skelton v. Comm'r of Soc. Sec.,* 2014 WL 4162536, at *11 (D. Or. Aug. 18, 2014) (explaining that the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders abandoned the GAF scale for several reasons, including "its lack of conceptual clarity" and "questionable psychometrics in routine practice").

her lower back condition caused pain to "shoot up" her spine, resulting in her neck tensing and knees "giving out." Tr. 57. In conjunction with her prescription medications, Scott testified that she also smoked cannabis daily for pain relief and relaxation, but had stopped drinking alcohol six weeks prior. Tr. 59. She described that she can no longer use her right hand because it "locks" on her. *Id.* She could walk for only 30 to 45 minutes before needing to rest, and sit for 20 to 30 minutes before needing to lie down. Tr. 61. Scott described her typical day as "pretty much lying around," watching television, listening to music, and chatting with family members when they visited. Tr. 64-65. Her daughter helped with bathing, dressing, cleaning, and cooking. Tr. 63. She alleged difficulty with memory, concentration, and sleep. Tr. 66. Noting the recent back MRI, Scott stated she was awaiting an appointment to see a back specialist. Tr. 69. Finally, Scott testified she no longer rides the bus out of fear that she will collapse. Tr. 72.

On February 24, 2015, the ALJ denied Scott's application for DIB and SSI. Tr. 15. Scott timely requested review of the ALJ's decision, Tr. 6, and the Appeals Council denied her request for review on June 3, 2016. Tr. 1-4. In consequence, the ALJ's decision of February 24, 2015, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF THE ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found Scott did not engage in substantial gainful activity at any time during the period from the alleged onset date of April 8, 2013, through the date of the hearing. Tr. 20.

At the second step, the ALJ found Scott had the following severe impairments: obesity, asthma, fibromyalgia, right wrist CTS and DQT, degenerative disc disease of the lumbar spine, adjustment disorder/major depressive disorder, PTSD, cannabis dependence, and a history of polysubstance abuse. *Id.*

PAGE 16 – FINDINGS AND RECOMMENDATION

At the third step, the ALJ found that none of Scott's impairments were the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, Subpt P, App. 1. Tr. 22. The ALJ therefore conducted an assessment of Scott's residual functional capacity ("RFC"). Specifically, the ALJ found Scott had the RFC to perform light work,[7] with the following additional limitations:

> The claimant can sit, stand and/or walk six hours out of an eight-hour workday. The claimant is limited to lifting ten pounds with the right upper extremity. The claimant can frequently handle and finger on the right. The claimant can occasionally climb ladders, ropes or scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl. The claimant has unlimited ability to climb ramps and stairs and balance. The claimant must avoid concentrated exposure to fumes, etc. and hazards. The claimant is limited to understanding, remembering, carrying out simple instructions, and occasional interaction with the public and coworkers.

Tr. 24. In reaching this finding, the ALJ stated that she considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. *Id.* The ALJ also considered opinion evidence. Tr. 27.

At the fourth step, the ALJ found that Scott was unable to perform her past relevant work. Tr. 30.

At the fifth step, the ALJ found in light of Scott's age, education, work experience, and RFC there were jobs existing in significant numbers in the national and local economy that she could perform. *Id.* Specifically, the ALJ found that Scott could perform the occupations of electronics worker, electrical accessories assembler, and photocopy operator. Tr. 31.

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

**ANALYSIS**

Scott argues the ALJ: (1) failed to give clear and convincing reasons for finding her subjective symptom testimony less than fully credible, and (2) failed to give sufficient reasons to reject the opinions of treating physician, Dr. Ackerman, and examining psychologist, Dr. Alvord. Each argument is addressed in turn.

## I.     Scott's Subjective Symptom Testimony

Scott first argues the ALJ erred in rejecting her subjective symptom testimony. The Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments; and must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen,* 80 F.3d at 1284.

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's testimony only if the ALJ provides clear and convincing reasons for doing so. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007). General assertions that the claimant's testimony is not credible are insufficient. *Id.* The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (citing *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir, 1995) (internal citation omitted). However, even if not all of the ALJ's findings for discrediting symptom allegations are upheld, the overall decision may still be upheld, assuming the ALJ provided other valid rationales. *Batson,* 359 F.3d at 1197.

The ALJ gave several rationales for discounting Scott's allegations concerning the intensity of her symptoms. First, the ALJ found Scott's "subjective complaints are not reasonably consistent with the medical evidence." Tr. 25. Inconsistency between a claimant's symptom allegations and objective medical evidence is a clear and convincing reason to reject a claimant's credibility when it is not the sole reason provided by an ALJ. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). Here, the ALJ noted that an "examination of [Scott's] fingers in March 2011 was unremarkable without tenderness, swelling or redness," and "[i]n October 2011, testing showed negative Phalen's sign and Tinel's sign." Tr. 25, 350, 380. The ALJ also noted that "[x]-rays of the right wrist did not show overt degenerative changes and the right wrist was normal without acute fracture or dislocation." Tr. 25, 385.

The ALJ's reliance on these selective treatment notes runs contrary to a fair reading of the record as a whole. The examinations and imaging studies the ALJ noted in support of her adverse credibility determination are outweighed by substantial record evidence showing abnormal results. *See, e.g.*, Tr. 386 (positive Phalen's sign); 387 (tenderness and positive Finkelstein's and Tinel's signs noted); 389 (positive Finkelstein's, Tinel's, and Phalen's tests and tenderness documented); 396 (same); 399 (swelling, impaired range of motion, and positive Finkelstein's observed); 406 (same); 419 (diagnosed with CTS and preliminary diagnosis of DQT confirmed by hand specialist based on Scott's abnormal nerve testing results). "[I]t is error for an ALJ to pick out a few isolated instances of improvement . . . and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). Moreover, the March 2011 record cited by the ALJ offers no support for her finding because that examination took place months before Scott injured her wrist on the job in October 2011. Tr. 380.

The ALJ also noted that Scott's CTS diagnosis was considered only "possible" as of September 2012. Tr. 25, 386. Here, the ALJ mischaracterized the record. In the very next sentence of the report cited by the ALJ, Dr. Ackerman stated he was "not going to make [CTS] a firm diagnosis," because he did "not have the results" from Scott's nerve conduction velocity testing for review at that time. Tr. 386. Three weeks later, Dr. Ackerman included CTS as a firm diagnosis after he was able to confirm Dr. Macha's interpretation of Scott's nerve testing. Tr. 387-88, 413.

Second, the ALJ found Scott's symptom allegations were undermined by Dr. Ackerman's opinion that her DQT would be "relatively easy" to fix with a cortisone injection and her course of conservative treatment. Tr. 25. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra*, 481 F.3d at 751 (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995)). Again, the ALJ mischaracterizes the record. After Scott received a cortisone injection in July 2013, she reported no noticeable improvement. Tr. 398-99. Dr. Ackerman later noted in January 2014 that "conservative care has not helped [Scott] overall." Tr. 411. Later that month, in a last attempt to avoid surgery, Dr. Macha recommended immobilization of Scott's wrist for a few weeks followed by more physical therapy. Tr. 417. After attending physical therapy for several months, Scott's physical therapist noted she had "not made significant gains." Tr. 435. Ultimately, Scott's providers observed that she "failed to improve with all conservative treatment including physical therapy, immobilization, corticosteroid injection[, and] activity modification," and noted that surgery was the only option remaining. Tr. 649, 652. Contrary to the ALJ's findings, the record shows that Scott's wrist issues were not fixed at all by a cortisone injection, and all other conservative treatment proved unsuccessful.

Third, the ALJ noted that "[a]s of March 2013, the record notes a number of no show appointments/missed therapy regarding [Scott's] right DQT symptoms, indicating compliance

problems." Tr. 25, 390. An "ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" as grounds for discrediting a claimant. *Molina v. Astrue*, 674 F.3d 1104 (9th Cir. 2012) (citation omitted). Here, the treatment note cited by the ALJ states that Scott missed some of her physical therapy because "she had a death in the family in California and has been unable to spend much time in Oregon." Tr. 390. This was a sufficient explanation for Scott's limited period of noncompliance. Furthermore, any notion that Scott was not compliant with her physical therapy is belied by the substantial number of sessions she regularly attended over the course of several years. *See supra* note 4.

Fourth, the ALJ found that "[a]s recently as December 2014, the worker's compensation claim was completed, without surgical approval," which "suggests that [Scott's] symptoms may not be to the degree alleged." Tr. 26. As Scott correctly notes, it is unclear why the insurance company denied surgical benefits, and "approval or disapproval for worker's compensation benefits is also dependent upon causation due to a work related injury." Pl.'s Br. at 12. The record is completely silent on why Scott's surgical claim was denied; thus, the ALJ's unsupported reliance on Scott's claim denial was not a clear and convincing reason for discrediting her testimony.

Fifth, the ALJ found that Scott could "perform a full range of daily activities" that were inconsistent with the nature and severity of her subjective complaints. Tr. 26. An ALJ may discount a claimant's testimony if it is inconsistent with the claimant's activities of daily living ("ADLs"), or if the claimant's participation in everyday activities indicates capacities that are transferrable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina*, 674 F.3d at 1112–13. A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative credibility finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick,*

157 F.3d at 722 (requiring the level of activity to be inconsistent with the claimant's alleged limitations to be relevant to his or her credibility).

In discrediting Scott's symptom testimony, the ALJ noted the following activities: she could prepare simple meals; she could perform light household chores; she was able to attend medical appointments and grocery shop; she could use public transportation and walk; and she socialized with her family by going to the park, eating out, and watching movies. Tr. 26, 299-306. In context, however, the ALJ's findings do not demonstrate a greater functional ability than Scott alleged. For example, Scott's ability to prepare simple meals was limited to preparing a sandwich, and she relied on her daughter for cooked meals. Tr. 63, 301. At the hearing, Scott testified that she also relies on her daughter to do the household chores, which is consistent with the 2013 function report, in which she stated that she could do some cleaning with breaks but depended on her daughter to finish. Tr. 63, 302.

In regards to grocery shopping, Scott reported in 2013 that she could walk around the store for a maximum of one hour before needing a period of extended rest. Tr. 304. At the hearing, she testified that she generally does not go grocery shopping anymore and uses a motorized cart if she does. Tr. 64. In 2013, Scott indicated that she used public transportation, but required someone to accompany her in case her legs went numb and caused her to collapse. Tr. 302. At the hearing, she testified that she no longer takes public transportation for her limited outings due to her fear of collapsing, and because she has a dependable means of transportation through family and friends. Tr. 72.

Despite the ALJ's assertion to the contrary, Scott's minimal activities are far from a "full range of daily activities." Tr. 26. Furthermore, her ADLs are not at odds with her symptom testimony. *Vertigan*, 260 F.3d at 1050 ("This court has repeatedly asserted that the mere fact that

a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Although the ALJ failed to make any findings relating to how Scott's ADLs transfer to workplace skills, given the nature in which she carries out her minimal daily activities, the Court finds that Scott's ADLs do not meet the threshold for transferrable work skills. *Orn*, 495 F.3d at 639 ("The ALJ must make specific findings relating to [the daily] activities and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination.") (internal citation omitted). Accordingly, Scott's minimal ADLs do not constitute a specific, clear, and convincing reason for discrediting her physical impairment testimony.

Sixth, the ALJ stated that Scott's daily cannabis use "reduces her credibility and contributes to her overall problems [and] lack of motivation." Tr. 27. This sweeping assertion fails to articulate how Scott's consistent and honest reporting of her cannabis use undermines her credibility. There is also no evidence in the record attributing Scott's perceived lack of motivation or her "overall problems" to cannabis use. Moreover, the ALJ's reasoning is further undermined by the fact that Scott was regularly using cannabis during the many years she was gainfully employed. Tr. 557. Thus, there is no evidence, let alone substantial evidence, to support the ALJ's finding in this regard.

Finally, the ALJ pointed out that Scott claimed her driver's license was suspended due to driving without insurance, but at other times represented that she has never had a driver's license. Tr. 27, 376, 635. Although "[a]n ALJ may consider inconsistent statements by a claimant in assessing her credibility . . . . A single discrepancy fails, however, to justify the wholesale

dismissal of a claimant's testimony." *Popa v. Berryhill*, 872 F.3d 901 (9th Cir. 2017) (as amended) (citing *Robbins*, 466 F.3d at 883-84).

For the reasons discussed, the ALJ failed to give specific, clear, and convincing reasons for discrediting Scott's subjective symptom testimony.

## II.  Medical Opinions

Scott argues the ALJ erred in giving little weight to the opinions of treating physician, Dr. Ackerman, and examining psychologist, Dr. Alvord.  To reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing" reasons for so doing. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-831).  If a treating or examining physician's opinion is in conflict with substantial medical evidence or with another physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id.*

### A.  Treating Physician Dr. Ackerman

In February 2014, Dr. Ackerman changed Scott's lifting limitation from ten-pounds to five-pounds, restricted her to minimal use of the right extremity, and instructed her to "minimize repetitive motion of [the] affected area." Tr. 510, 572. As detailed above, Dr. Ackerman kept these restrictions in place until the last record of treatment in August 2014. Tr. 499, 500, 502, 504, 506-07, 566-71.  Dr. Ackerman's limitations were contradicted by the opinions of reviewing physicians, Drs. Brown and Wiggins, Tr. 115-20, 127-132, 141-146, 153-158; therefore, the ALJ needed to provide specific and legitimate reasons to reject his opinion.

The ALJ gave little weight to Dr. Ackerman's assessments because the "limits are vague and uncertain about time duration." Tr. 28. She also found that "Dr. Ackerman did not cite to any objective testing as supporting evidence. Presumably, he relied heavily on [Scott's] subjective complaints about her restrictions." *Id.* The ALJ's stated rationales find no support in

the record. As Scott argues, "[t]here is nothing 'vague' about" Dr. Ackerman's restrictions, which are "square within social security's regulatory framework." Pl.'s Br. at 5 (citing Tr. 28). For example, the SSA classifies different levels of work based primarily on the maximum amount of weight that is expected to be lifted in that job category. *See* 20 C.F.R. § 404.1567. Moreover, in formulating the RFC, an ALJ is required to assess a claimant's physical limitations, "including manipulative . . . functions, such as reaching [and] handling." 20 C.F.R. § 404.1545. As such, Dr. Ackerman's assessments were not vague and could have been incorporated into the RFC as specific limitations.

Further, over the course of approximately three years, Dr. Ackerman appeared to reassess Scott's right wrist limitations after nearly every appointment based on her then present condition. *See, e.g.*, Tr. 380-411, 499-510. Given the continuing care Scott received from Dr. Ackerman, the assigned limitations were clearly intended to last until Scott was reevaluated at her next appointment. So, there was nothing "uncertain" about the time duration of Scott's limitations. The Commissioner asserts the ALJ's concern was that "Dr. Ackerman did not explain whether he believed [Scott's] right hand problem resulted in permanent limitations or whether they were only temporary." Def.'s Br. at 6. As the Commissioner explains, "[t]his distinction is important when adjudicating disability cases, because claimants are not eligible for benefits if their impairments do not cause limitations that can be expected to last for a continuous period of not less than twelve months." *Id.* (citing 42 U.S.C. § 423(d)(1)(A)). The Commissioner's argument, however, is foreclosed by the ALJ finding CTS and DQT "severe impairments" at step-two of the sequential analysis, because in order for an impairment to be deemed severe it must be expected to result in death or last for at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); *see also* 20 C.F.R. § 404.1509.

Furthermore, the ALJ's assertion that Dr. Ackerman failed to cite objective testing in support of the limitations—instead relying on Scott's subjective complaints—is contrary to the record. It appears that the ALJ focused solely on the worker's compensation assessments completed by Dr. Ackerman. Tr. 28. These check-the-box forms do not contain any citation to objective testing. Tr. 566-72. However, the worker's compensation assessments were prepared in conjunction with Dr. Ackerman's treatment notes, as evidenced by the corresponding dates and restrictions contained within the records. *Compare* Tr. 502-510, *with* Tr. 566-72. Dr. Ackerman's treatment notes are replete with objective testing, including consistent abnormal Tinel's, Phalen's, and Finkelstein's tests, as well as the doctor's numerous observations of swelling and reduced range of motion. *See, e.g.*, Tr. 499-510. Clearly, Dr. Ackerman based the limitations he included in the worker's compensation assessment forms on the objective tests he administered and the observations he made while examining Scott. *See Popa*, 872 F.3d at 907. Accordingly, the ALJ's findings were not based on substantial evidence, and were not specific and legitimate reasons for giving little weight to Dr. Ackerman's opinion.

**B.     Examining Psychologist Dr. Alvord**

Dr. Alvord's findings of moderate to marked limitations in understanding and memory, concentration and persistence, social interaction, and adaptation were contradicted by the findings of examining psychologist, Dr. McConochie, and reviewing consultants, Drs. David Scott and Bill Hennings. *Compare* Tr. 293, *with* Tr. 114-15 (finding no impairment or mild impairment), Tr. 140 (same), *and* Tr. 377-78 (same). Thus, the ALJ needed to provide only specific and legitimate reasons for rejecting Dr. Alvord's opinion. *Bayliss,* 427 F.3d at 1216. Here, the ALJ did just that.

The ALJ discounted Dr. Alvord's opinion because "[t]he marked limitations are inconsistent with the relatively normal mental status examination, finding intact thought

processes and good memory." Tr. 29. When evaluating conflicting opinions, an ALJ is not required to accept an opinion that is unsupported by clinical findings, or is brief or conclusory. *Thomas*, 278 F.3d at 957. For example, the ALJ noted that Scott's examination "showed [her] thought processes were intact with no evidence of tangentiality, circumstantiality, or flight of ideas." Tr. 28. Dr. Alvord also noted that Scott's short-term, long-term, and working memories were intact, and she was able to perform simple calculations correctly. Tr. 28, 635-36. The ALJ's finding that Dr. Alvord's assessments of marked limitations in concentration and memory were disproportionate to Scott's largely unremarkable mental status examination results was a specific and legitimate reason to give Dr. Alvord's opinion little weight.

The ALJ also found Dr. Alvord's opinion that Scott was markedly limited in her ability to travel to unfamiliar places or use public transportation was inconsistent with her reports of taking the bus. Tr. 29, 635. Here, the ALJ did not err because a discrepancy between a physician's opinion and a claimant's daily activities can provide a specific and legitimate reason to reject that opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Morgan*, 169 F.3d at 600-02 (finding an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount that opinion).

Finally, to the extent the ALJ found Dr. Alvord's limitations were supported by the record, they were adequately accounted for by the ALJ in the RFC. For example, Dr. Alvord's opinion that Scott was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors was accounted for by the RFC limiting Scott to only occasional interaction with co-workers. Tr. 24, 642. Moreover, any further limits on Scott's cognitive abilities were also addressed by the RFC limiting her to understanding, remembering,

and carrying out only simple instructions. Tr. 24, 641-42. Accordingly, the ALJ did not err in giving little weight to Dr. Alvord's assessed limitations.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011) (citing *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (en banc)). However, even if all the requirements of the analysis are met, the Court may nevertheless remand "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled" within the meaning of the Act. *Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir.

2015) (quoting *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014)) (internal quotation marks omitted).

The ALJ's failure to credit the testimony of Scott and Dr. Ackerman was erroneous for the reasons set out above, satisfying the first prong of the credit-as-true analysis. The Commissioner argues that an immediate award of benefits is unwarranted because there are outstanding issues that need to be resolved. Namely, "[t]he ALJ would need to resolve the conflicts between Plaintiff's testimony and the opinions of Dr. McConochie and the State agency consulting doctors." Def.'s Br. at 13. Any potential conflict between Plaintiff's testimony and the medical opinion evidence need not be resolved, however, because Dr. Ackerman's opined lifting and manipulation limitations alone are sufficient to find Scott disabled, satisfying the second prong of the analysis. Indeed, at the administrative hearing, the VE testified that a hypothetical individual who was limited to lifting no more than five pounds and occasional handling and fingering with the right upper extremity would be precluded from employment. Tr. 77-78. These restrictions were in addition to the other limitations the ALJ included in the RFC contained in her written decision. Tr. 24, 77-78. Thus, had Dr. Ackerman's opinion been properly credited, Scott would have been found disabled on this record, satisfying the final prong of the credit-as-true analysis. Accordingly, no useful purpose would be served by further proceedings, and an immediate award of benefits should be directed.[8]

---

[8] Without further explanation, the Commissioner argues that an award of benefits is inappropriate because the record raises serious doubts as to whether Scott is disabled. The Court declines to fashion arguments the Commissioner declines to elucidate herself. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for a[ party], and a bare assertion does not preserve a claim . . . . '[J]udges are not like pigs, hunting for truffles buried in briefs.'" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)) (internal brackets omitted).

## RECOMMENDATION

For the reasons set forth above, the ALJ's decision finding Scott not disabled is not supported by substantial evidence in the record and should therefore be REVERSED and REMANDED for an immediate payment of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 17 th day of November, 2017.

Honorable Paul Papak
United States Magistrate Judge